## BURDON v. WOOD.

### No. 8486.

Circuit Court of Appeals, Seventh Circuit.

May 11, 1944.

Rehearing Denied June 5, 1944.

Floyd E. Thompson, of Chicago, Ill., and Edward E. Meyer and John W. Spencer, both of Evansville, Ind., for appellant.

Charles M. La Follette, Herman L. McCray and John H. Jennings, all of Evansville, Ind., for appellee.

Before SPARKS, KERNER, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

The plaintiff-appellee, as administratrix of the estate of her deceased husband, Robert Burdon, brought suit against the defendant-appellant, Clarence Wood, alleging that on September 23, 1942, the defendant had unlawfully shot and killed her husband. The defendant in his answer admitted killing the plaintiff's husband, but al-

leged that he acted in self-defense and that therefore the killing was not wrongful.

At the close of all of the evidence, the defendant moved for a directed verdict. The court took the motion under advisement. The jury returned a verdict for the plaintiff, and the court rendered judgment on the verdict. The defendant then moved the court to set aside the verdict of the jury and the judgment and to enter judgment in accordance with the defendant's motion for a directed verdict and in the alternative for a new trial. Both motions were overruled. From judgment upon the verdict, the defendant has appealed. The only question presented is whether the court below erred in not directing a verdict or in not setting the verdict aside and sustaining the pending motion to direct a verdict.

Robert Burdon was a bartender employed at a roadhouse operated in Henderson County, Kentucky, by Dells, Inc., a corporation, of which the defendant was president and general manager. Burdon's working hours were from about 6:00 p. m. to 2:00 a. m. In this roadhouse was a bar thirty feet in length, which ran north and south across the east end of the room. The south end of the bar was open, and within about three feet of that end of the bar was a door in the east wall leading to an outside dance floor. In the same wall, about fifteen inches south of the first door, was a second door leading into the yard. Behind the bar, which was about three feet high, was a slat false floor laid about four inches above the regular floor. There was a water cooler on the bar in about the middle.

On the evening prior to the shooting, the defendant had visited three other taverns and roadhouses in the company of a friend and his wife. He testified that he had several drinks during the evening. He returned to the Dells property about 2:00 a. m. and went to bed in a trailer which was parked behind the roadhouse. He carried a gun in his pocket which he had taken out of his car and had on his person between four and five thousand dollars in cash. About seven-thirty o'clock the morning of September 23, 1942, the defendant, getting up to go to the toilet, heard an argument going on in loud tones in the barroom. He entered the barroom by the door which led in from the yard and found the decedent, who had remained drinking after finishing his work around 2:00 a. m., standing behind the bar near the south end arguing with Delbert Winchell, another employee, who was standing across the bar from him. Merl Wood, also an employee, was present. Sandefur, the day bartender, was behind the bar filling an icebox with cokes. The defendant passed behind the bar to go to the water cooler, and, as he passed Burdon, he admonished him and Winchell to quit arguing, saying they all had to get along together.

The defendant passed on to the water cooler, took a drink of water and returned past the decedent to the door where he had entered and here in a sharper tone told the decedent, who was trying to renew the argument, to quit arguing and go on home. The decedent retorted angrily that he did not have to take orders from anybody, that he would do as he "damned please," and that he would blow the defendant's "damned brains out." Thereupon, the decedent pulled his gun and fired a shot at the defendant, which missed. Instantly, the defendant pulled his gun and fired from the hip at the decedent. He was not as tall as the decedent and was standing on the regular floor, while the decedent was on the raised false floor. The defendant fired two shots, one of which hit the decedent in the upper lip below his nose and ranged upward, emerging at the back of his head one and one-half inches below the crown, according to the physician who attended him. He fell behind the bar with his feet near its south end and slightly on his right side, with his gun lying at his finger tips. The decedent lay in a dying condition where he had fallen and no one did anything to or for him. The sheriff was summoned by Merl Wood at the instruction of the defendant, and after he arrived, he had his deputy call for an ambulance. The decedent was taken to a hospital in Henderson, Kentucky, where he died about an hour later. On his face were slight powder burns. The sheriff opened decedent's gun and found a discharged cartridge shell in one chamber. Upon smelling the barrel of the gun, he detected it had been fired recently. The sheriff, who had worked for the defendant two years before, did not lock him up but took him home with him and kept him there while the grand jury investigated the case. The grand jury exonerated the defendant.

There was no dispute as to any essential fact. No witness was impeached. There was some variance in the stories of the several witnesses on non-essential matters, but all agreed on the essential facts. All eyewitnesses testified that the decedent, with resentment toward the defendant and with a declaration that he would blow the defendant's "damned brains out," fired at the defendant, who then shot and killed the decedent.

Under this state of the evidence, should the court have sustained one or the other of the motions of the defendant for a directed verdict? Upon a showing that the defendant had shot and killed the decedent, a prima facie case of wrongful death was made out, and it then became the duty of the defendant to justify the killing. Schlosser v. Griffith, 125 Ind. 431, 25 N.E. 459; Norris v. Casel, 90 Ind. 143.

The defendant in his answer denied that his act was wilful, wrongful, grossly negligent, or without provocation, as alleged in the complaint. He alleged that he shot the decedent in self-defense. The law of self-defense is the same in Kentucky as in Indiana. Shields v. Neal, 158 Ky. 695, 166 S.W. 211; Enlow v. State, 154 Ind. 664, 669, 670, 57 N.E. 539; Fields v. State, 134 Ind. 46, 55, 32 N.E. 780; Gill v. Commonwealth, 235 Ky. 351, 31 S.W.2d 608; Hill v. State, 212 Ind. 692, 701, 11 N.E.2d 141. The law of self-defense applicable to the defense of one's person may be stated thus: If one is in a place where he has a right to be and is himself without fault, and he is assailed by another armed with a deadly weapon, he may repel force with force without retreating, even to the point of taking his assailant's life, if he believes and has reasonable cause to believe that he is in danger of losing his life or of suffering great bodily harm at the hands of his assailant.

The defendant, as president and general manager of the corporation which owned the Dells, had a right to be in the barroom. His admonition to the decedent to cease quarreling and go home because the employees had to get along together, was not a wrongful act but was in keeping with his duty as manager. The only inference possible from the evidence is that the decedent, who had been drinking and quarreling, assaulted the defendant in anger with a deadly weapon. The defendant repelled the assault of the decedent without retreating, as he had a right to do.

We do not think that reasonable men could disagree with the proposition that the defendant had reason to believe that his life was in danger or that he was in danger of receiving great bodily harm at the hands of his assailant. No man could have stood in the shoes of the defendant in that awful moment without fearing death or great bodily harm at the hands of the decedent. When the defendant fired, he had a right to act upon the appearance of things which could not spell anything but great danger to his person. Enlow v. State, supra. Where the material evidence from the lips of unimpeached witnesses is non-conflicting and could lead honest, disinterested, and reasonable men to but one conclusion, there are no factual matters to be resolved which call for the intervention of a jury. Such facts await only a court to announce their effect in law. Pennsylvania R. R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; Troutman v. Mutual Life Ins. Co., 6 Cir., 125 F.2d 769, 772, 773.

The plaintiff, to justify the submission of the case to the jury, has pointed out some conflicts in the evidence as to how far apart the defendant and the decedent had to be for the decedent to receive powder burns. There was no dispute that the burns were there and that the parties were close enough to make them. What difference does it make how far apart they were? Also, there was difference between witnesses as to where the bullet emerged from the decedent's head. Wherever it came out, its force was sufficient to kill the decedent. It would be natural for the bullet to range upward since the defendant was shorter than the decedent, shot from the hip, and stood on a floor four inches lower than that on which the decedent stood.

The plaintiff argued that there was evidence from which the jury could have found that a bullet discovered embedded in the door jamb, behind where the defendant had stood when the decedent shot at him, did not come from the decedent's gun because a bullet from his gun would not have made the kind of hole that this bullet left in the wall. From this it was argued that the decedent did not fire his gun at all, although all of the eyewitnesses had sworn that he did and lying beside his

dying body was his gun with one empty shell in the chamber. Several witnesses testified that the gun smelled of having been recently fired. Even if it were admitted that the bullet found in the door jamb did not come from the decedent's gun, that is no proof that his gun was not fired. Taking the view of that circumstance strongest for the plaintiff, it is only negative proof that the bullet did not come from the decedent's gun. It is no evidence at all that his gun was not fired.

At the oral argument the plaintiff made some point of the fact that all of the eyewitnesses were employees of the corporation of which the defendant was president and general manager. Suppose they were. On no essential fact was there a conflict of evidence. Not one of the eyewitnesses was impeached on any material issue. Indeed, the plaintiff put the defendant and all except one of these eyewitnesses on the stand as her own witnesses. Why Sandefur was not called by the plaintiff does not appear. The plaintiff cannot challenge her own unimpeached witnesses. Certainly no factual situation authorizing a submission of the case to the jury is presented.

We think the court should have sustained the motion of the defendant for a directed verdict, and, having failed to do that, it should have sustained the motion of the defendant to set aside the verdict and should have entered an order sustaining the defendant's motion for a directed verdict.

The judgment is reversed, with directions to the District Court to proceed in accordance with this opinion.